IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

DENISE REVARD-CURREY,                )
                                     )
            Plaintiff,               )   Case No. CV05-6363-HU
                                     )
      vs.                            )   OPINION AND ORDER
                                     )
MICHAEL J. ASTRUE,[1]                )
Commissioner of Social Security,     )
                                     )
            Defendant.               )
_____)

Donald V. Reeder
Glenn, Sites & Reeder
205 S.E. 5th Street
Madras, Oregon 97741
      Attorney for plaintiff

///

_____

[1] On February 12, 2007, Michael J. Astrue became the Commissioner of Social Security. He is substituted as the defendant in this action pursuant to Fed. R. Civ. P. 25(d)(1) and 20 U.S.C. section 405(g).

1   - OPINION AND ORDER

Karin J. Immergut
United States Attorney
District of Oregon
Neil J. Evans
Assistant United States Attorney
1000 S.W. Third Avenue, Suite 600
Portland, Oregon 97204
David R. Johnson
Special Assistant United States Attorney
Office of the General Counsel
Social Security Administration
701 Fifth Avenue, Suite 2900 M/S 901
Seattle, Washington 98104
    Attorneys for defendant

HUBEL, Magistrate Judge:

    Denise Revard-Currey brought this action pursuant to Section 205(g) of the Social Security Act (the Act), 42 U.S.C. § 405(g), to obtain judicial review of a final decision of the Commissioner of the Social Security Administration (Commissioner) denying her application for disability insurance benefits.

### Procedural Background

    Ms. Revard-Currey filed for Title II benefits on March 20, 2000. She alleges disability on the basis of back pain, carpal tunnel, depression, anxiety, neurological problems and a somatic disorder. She alleges that she became unable to work on March 1, 1998.

    Ms. Revard-Currey's applications were denied initially and on reconsideration. A hearing was held on July 11, 2003, before Administrative Law Judge (ALJ) John J. Madden, Jr. Ms. Revard-Currey and her husband testified at the hearing, as did a medical

2  - OPINION AND ORDER

expert (ME), Susan Dragovich, and a vocational expert (VE), Eileen Linicome. On October 21, 2003, ALJ Madden issued a decision finding Ms. Revard-Currey able to perform her past relevant work as an insurance clerk, and therefore not disabled.

Two years later, on October 4, 2005, the Appeals Council denied Ms. Revard-Currey's request for review, making the ALJ's decision the final decision of the Commissioner.

## Factual Background

Born on September 4, 1956, Ms. Revard-Currey was 47 years old at the time of the ALJ's decision, and is now 50 years old. She has a high school education and two years of college courses. Her past relevant work has been as an insurance clerk, insurance checker, case aide, employment referral clerk, and coffee maker. She last worked in 1999, except for brief work attempts in 2003.

## Medical Evidence

In April 1982, Ms. Revard-Currey sustained an on-the-job injury. Tr. 167. She related that she was filing tapes in a library and kneeling with 35 pounds of reels on her left arm. Id. She tried to rise, but could not because of back pain. Id.; tr. 171. She developed numbness and tingling in her left arm, upper and lower back pain, left hip pain, and numbness in her arms and both legs. Id. She was seen by Cecil Miller, M.D. Dr. Miller prescribed physical therapy, hot packs, ultrasound, therapeutic massage, exercise, and a cervical collar. Id. Ms. Revard-Currey

told Dr. Miller she had also been exposed to chemicals at work, including various types of fumes, but her employer denied this. Tr. 170.

Ms. Revard-Currey was treated by Robert Cassidy, M.D. from April 28, 1982, to June 15, 1984. Tr. 180, 190. In April 1982, her complaints were numbness, tingling, and weakness in all her limbs. Tr. 193. Dr. Cassidy noted that Dr. Miller had ordered x-rays of her cervical, thoracic, and lumbar spine, and performed a physical examination, and all findings were within normal limits. Id.

Dr. Cassidy treated her conservatively. Tr. 187. In August 1982, Dr. Cassidy discussed the possibility of her returning to work. Tr. 188. In September 1982, Dr. Cassidy noted that Ms. Revard-Currey was working at a job that enabled her to get up and move around freely. Tr. 187. She continued to improve. Id. In March 1983, examination still revealed tenderness to palpation in the upper and lower back on the left side, but Dr. Cassidy thought her condition was "mostly myofascial." Tr. 184. Dr. Cassidy advised her to increase her activities within her pain tolerance. Id.

On November 20, 1983, two physicians at the UCLA Pain Management Center, wrote a letter to Ms. Revard-Currey's worker's compensation carrier. Tr. 172-73. They related that Ms. Revard-Currey had been seen at the UCLA Pain Management Center on

October 31, 1983, but that "[t]he history of the initial work-related injury varies somewhat ... she describes a six month gradual onset of left shoulder and low back pain beginning in early 1982." Tr. 172. The doctors stated that Ms. Revard-Currey was currently using transcutaneous electrical nerve stimulation (TNS), at erratic settings and on no regular schedule, and that she noted some pain relief with this treatment. Id. She was not using medication. Id.

The doctors stated:

The patient continues to work a 40+ hour week. ... She is also complaining of a second problem, that of numbness in her left leg and some hyperesthesia of the lateral aspect of her left arm.  ... Her initial somatic diagnosis is myofascial pain.

Tr.  173. Ms. Revard-Currey was seen at UCLA until September 1994, receiving acupuncture treatments from the Pain Clinic for musculoskeletal pain and also receiving treatment for tinnitus and dizziness. Tr. 210-257.

On December 13, 1983, Dr. Cassidy reported to Ms. Revard-Currey's worker's compensation carrier that her pain was intermittent and mild in the lower back, with intermittent frontal headaches. Tr. 179. She complained of tenderness and mild muscle spasms in the lower lumbar paraspinous muscles were noted. Id. Dr. Cassidy noted that Ms. Revard-Currey was currently working and, in Dr. Cassidy's opinion, could continue to do so. Id.

On June 13, 1984, Dr. Cassidy noted continued complaints of mild, intermittent lower back and neck pain and constant headaches. Tr. 175. In addition, she complained of numbness in the left lower leg and the left arm, exacerbated by prolonged walking, more than 15 minutes of sitting, or standing in one position. Id. A CT scan showed disc bulges at the L5-S1 and L4-L5 levels. Id. Dr. Cassidy opined that Ms. Revard-Currey might require "intermittent medications and physical therapy," and that she was restricted from doing work that required repetitive bending, stooping, prolonged standing, lifting of more than 20 pounds or repetitive lifting of any weight. Id.

On January 30, 1995, David Cawthon, M.D., a neurologist, saw Ms. Revard-Currey for a headache associated with left sided numbness, and tingling in the trunk and thigh, left calf, and left buttock. Tr. 259. Ms. Revard-Currey reported a neck and back injury in 1982, for which "she does not recall any extremity symptoms." Id.[2] Rather, she reported fainting episodes about that time, and vertigo over the past 10 years, for which she had multiple tests. Id. She reported that her vertigo was severe three times a year, but was occurring mildly twice a month, for which she would take Valium. Tr. 260. Ms. Revard-Currey reported a toxic exposure to roach pesticides and perhaps other chemicals

---

[2] Although the treatment records for the years 1982-84 contain multiple complaints of pain, numbness and tingling in the arms and legs. See, e.g., tr. 175, 183, 185, 187, 188, 191.

that she felt triggered the vertigo, as well as short term memory loss problems. Id.

Physical examination was normal. Tr. 260-61. Dr. Cawthon's impression was classic migraine. Tr. 261. He started her on amitriptyline. Id. Dr. Cawthon reviewed a brain MRI scan from September 1994, and an ECG, both of which appeared normal. Tr. 262.

X-rays of the cervical spine taken on June 10, 1996, showed suitable vertebral body alignment, normal disc spaces, and normal vertebral body height. Tr. 274.

In a patient report dated August 5, 1999, physical therapist Shawn Cates wrote that Ms. Revard-Currey reported a 20+ year history of chronic pain involving elements of her cervico-thoracic and lumbar spine, which had been caused by a lifting incident. Tr. 518.

Ms. Revard-Currey told Cates she was in school part-time during the summer and full-time during the fall, winter and spring, as well as working 25-30 hours a week assisting disabled students. Id. She was walking every evening for 30-40 minutes, briskly, participating in a water aerobics program, and using yoga for stretching and relaxation. Id. Ms. Revard-Currey told Cates her spinal pain was aggravated by sustained sitting, forward bending, and extended reaching. She also complained of numbness and tingling in both arms and hands. She said typically,

this came on toward the evening and at recumbent positions, more so than during the day. Id.

On August 27, 1999, Ms. Revard-Currey was seen by Ellen Modell, M.D., a neurologist, for evaluation of upper extremity numbness. Tr. 298. Ms. Revard-Currey related that in her mid-20s, she had a toxic exposure to roach poison and developed a number of neurologic complaints including memory loss, numbness, tingling, and gait disturbance. Id. She stated that over the years, she got better, but felt there were still some residuals. Id. She also described an injury that occurred in her mid-20s, stating that she had "herniated discs both in her neck and her low back." Id.

Ms. Revard-Currey told Dr. Modell the numbness had been present for at least a year and a half, and involved her arms and hands. She also described numbness and tingling with flexion of her head [**sic**], and occasional numbness in her feet, as well as pain in her hands that caused her to wake up in the middle of the night. Id. Ms. Revard-Currey further described a "feeling of cold that starts in her chest and radiates upward and is accompanied by some confusion." Id.

Examination showed normal sensory, coordination and reflex findings. Tr. 299. Dr. Modell thought the numbness and tingling of the upper extremities might be secondary to cervical spine involvement. Id. Dr. Modell did note positive Tinel's sign at the

wrist suggestive of carpal tunnel syndrome. Id. Dr. Modell did not see evidence of a generalized peripheral neuropathy or evidence of multiple sclerosis (MS). Id. Dr. Modell ordered an MRI of the cervical spine and an EMG to rule out carpal tunnel syndrome.

An MRI report dated October 6, 1999, found moderate disc bulge at C3-C4, C4-C5, and C5-C6; moderate degenerative arthropathy and associated moderate stenosis of the neural foramina at C3-4, and C5-6, but no demyelination in the brain stem or the cervical segment of the spinal cord indicative of MS. Tr. 511.

On September 13, 1999, Ms. Revard-Currey saw Susanne Quistgaard, M.D., to ask for pain medication. Tr. 512. Dr. Quistgaard had a discussion with her about it, telling Ms. Revard-Currey that because her pain was chronic, she did not wish to place her on chronic narcotic medication. Id. Ms. Revard-Currey requested Valium, which Dr. Quistgaard refused because of its addictive nature. Id. Dr. Quistgaard recommended that she try an anti-inflammatory agent, but Ms. Revard-Currey refused. Id. Dr. Quistgaard then suggested a pain specialist, but Ms. Revard-Currey said she had been seen by a pain clinic at UCLA without help. Id. Dr. Quistgaard wrote, "Patient also brings up the fact that she would like to go on disability as she feels disabled by her multiple medical problems." Id.

On October 16, 1999, Ms. Revard-Currey was seen by Edwin Vyhmeister, M.D., at Northwest Hand Specialists. Tr. 302. Dr. Vyhmeister noted that x-rays were normal, but EMG study was consistent with mild bilateral carpal tunnel syndrome. Tr. 303. Dr. Vyhmeister diagnosed bilateral carpal tunnel syndrome and thoracic outlet syndrome/cervical radiculopathy. Id. He prescribed therapy, splints, and vitamins. Id.

An MRI of the brain was done on October 27, 1999. Tr. 510. On November 10, 1999, Dr. Modell wrote that the MRI was unremarkable except for a single hyperintense focus in the right posterior cerebellar hemisphere of unclear significance. Tr. 509. Dr. Modell doubted that this represented MS, but decided to follow with a repeat MRI in six months. Id.

Dr. Modell diagnosed chronic pain syndrome, noting, "I do not have a good explanation for this." Id. Dr. Modell thought that although Ms. Revard-Currey had mild sensory carpal tunnel syndrome, surgery was not indicated because carpal tunnel syndrome did not explain her symptoms. Id.

Although Ms. Revard-Currey had asked Dr. Modell for narcotic pain medication, and became "upset and agitated," Dr. Modell refused to prescribe it, saying, "I do not think it is a good idea." Id. Instead, Dr. Modell increased her Neurontin dosage. Id.

On March 8, 2000, Ms. Revard-Currey was seen by Richard

Koller, M.D. Tr. 340. She complained of her body going totally numb, worse on the left side than the right; neck and upper back aching; shoulder blade aching and tightness; arm tingling and cramping; numbness and tingling of the hands; and numbness in the legs, with dragging of the left leg. Id. She also described decreased ability to think and concentrate; difficulty with speech; and increased frustration over the past year. Id. Other complaints were waking early, weight gain, poor appetite, excessive fatigue, ringing in the ears, choking spells, irregular heart beat, swollen ankles, diarrhea, frequent headaches, weakness, tremors, balance and coordination problems, dizziness, trouble walking, and mood swings. Id.

Ms. Revard-Currey told Dr. Koller she was injured in the late 1970s, when she was "flinging 50 lb. boxes and felt something rip from her tailbone to her neck and was on disability for 2 years because of that." Id. Upon examination, musculoskeletal, gait, motor, sensation, and coordination findings were normal. Cranial nerves were normal. Tr. 342.

Dr. Koller thought the carpal tunnel syndrome was the cause of a significant portion of Ms. Revard-Currey's symptoms in the arms and hands, and partly responsible for some of the neck and upper back symptoms, "though this is less certain." Tr. 343. Dr. Koller had no explanation for the numbness in the legs or the dragging of the leg, as the "MRI shows no explanation for this."

Id. He found no evidence of demyelinating disease and no significant spinal stenosis that would produce myelopathy. Id. Although Ms. Revard-Currey had a disc that was producing neural foraminal stenosis, worse on the right than the left at the C5-6 level, "she is not having symptoms referable to that." Id.

On June 23, 2000, Ms. Revard-Currey was seen by D.E. Fohrman, M.D. for evaluation of possible fibromyalgia. Tr. 379. She complained of fainting, memory loss, difficulty walking, and inability to function. Id. She told Dr. Fohrman she had seen many doctors and had many diagnoses, including MS, brain tumor, and hypochondriasis. Id. Ms. Revard-Currey told Dr. Fohrman she was completely disabled for a period of time, but after two years gradually improved, due to a regimen of health food, vitamins, yoga, and detoxification. Id. She reported that in her late 20s, she was having difficulty with memory and "spells where she would have a cold feeling and difficulty with breathing." Id. She reported another diagnosis at that time of MS, as well as diabetes. Id.[3]

Ms. Revard-Currey described muscle aches, numbness and tingling in the hands, arms, face, and other areas at different times, sacroiliac pain, and headaches, all of which had slowly worsened until four years previously, when "she thinks they

---

[3] The medical record does not show a diagnosis of MS, brain tumor, or diabetes.

worsened overnight." Id. She reported that treatment of her carpal tunnel with splints yielded no improvement. Id.

Ms. Revard-Currey also complained of cognitive disorder, dizziness, loss of balance, fatigue, trouble sleeping and something she described as "nerve bites," saying her hands tended to "claw and contract at various times." She said she was always sick with colds. Id.

Physical examination was unremarkable except for generalized discomfort over trigger point areas of the upper and lower extremities as well as the trunk and scattered areas of tenderness in joints of bony prominences. Id. Although Ms. Revard-Currey claimed to be unable to stand on either foot, she was able to do so reasonably well. Id. She had slight difficulty balancing with squatting, but was able to get down and rise without significant assistance. Id.

Dr. Fohrman's diagnostic impression was "positive fibromyalgia and/or somatization disorder." Id. She did have numerous areas of tenderness, but also had significant neurocognitive complaints, which were "beyond those I would expect to see with usual fibromyalgia." Id. Ms. Revard-Currey stated that she had read a booklet on fibromyalgia and felt she had most of the symptoms. Id. Dr. Fohrman thought it reasonable to see whether any benefit could be obtained using antidepressants and nonsteroidal anti-inflammatory agents

(NSAIDs), along with nonnarcotic analgesics. Id. Dr. Fohrman wrote that he had not addressed the issue of psychiatric evaluation, "either in the context of pain management or as an underlying etiology for some of her current problems." Id.

On June 27, 2000, Mary Ann Westfall, M.D., a specialist in physical medicine and rehabilitation, performed a records review on behalf of the Commissioner. Tr. 305-312. In Dr. Westfall's opinion, Ms. Revard-Currey was able to lift 50 pounds occasionally and 25 pounds frequently; stand or walk about six hours in an eight hour workday; and sit about six hours in an eight hour work day. Dr. Westfall opined that Ms. Revard-Currey was limited in her ability to reach overhead because of her cervical degenerative disc disease, and that her diagnosis of bilateral carpal tunnel syndrome supported limitations on handling objects to no more than occasionally. Tr. 308.

On November 30, 2000, Ms. Revard-Currey returned to Dr. Koller with concerns about MS. Tr. 336. She told Dr. Koller that in 1981 she was toxically exposed when she moved into a home right after it was sprayed for roaches. Id. Ms. Revard-Currey believed that this exposure damaged her nervous system. Id. She said she was seen by UCLA and told she might have MS. Id.

Her current symptoms included chronic pain in the neck, trapezius ridges, upper arms, mid- and low-back, and posterior legs; muscle spasms in the back and legs periodically, worse on

the right; tremor in her head and arms at times; blurry vision from time to time; and intermittent dizziness. Id.

Ms. Revard-Currey reported falling easily and having a poor memory. Id. She said both hands and arms went numb and tingly at times, including at night. She had trouble opening jars and dropped things. Id. She was currently on oxycodone and a number of other medications for chronic pain. Id. Ms. Revard-Currey mentioned that she had "large red blood cells and what sounds like a megaloblastic anemia," but Dr. Koller noted that her B 12 levels were normal and no cause for this enlarged red blood cell had been determined. Id.

Ms. Revard-Currey also said she had a poor appetite, was excessively fatigued, had ringing in her ears, trouble swallowing, choking spells, irregular heart beat, swollen ankles, joint pain, leg cramps, frequent headaches, difficulty concentrating, numbness, weakness, tremors, anxiety, mood swings, and an irregular menstrual cycle, and that she bruised and bled easily. Tr. 337.

Physical examination was normal, including gait and station, muscle strength and tone, and coordination. Neurological examination was normal. Mental status examination showed that her memory was intact for recent and remote events, her speech was fluent, and she was able to follow complex commands without difficulty. Tr. 338. Dr. Koller concluded,

> Patient presents with multiple complaints as outlined
> above. Believe she probably has a myofascial pain
> syndrome or chronic pain syndrome. Cannot find any
> clear-cut neurologic deficit, but she certainly has
> neurologic components in the form of dysequilibrium
> and numbness.

Id. Dr. Koller thought she might have some mild carpal tunnel, as documented in the past by nerve conduction studies, but he doubted she had MS. Tr. 339.

On January 2, 2001, Ms. Revard-Currey was given a psychological examination by William Trueblood, Ph.D., to rule out somatoform disorder and to evaluate her depression and anxiety. Tr. 319. Dr. Trueblood emphasized in his report that Ms. Revard-Currey was the primary source of information about her current functioning and personal history, although he had also reviewed her records. Id.

Ms. Revard-Currey told Dr. Trueblood that in the 1980s, her apartment had been sprayed for roaches just a day before she moved in, and within six months, "she was totally disabled and partially paralyzed." Tr. 323. She said she recovered slowly. Id.

Ms. Revard-Currey complained of inability to stand, sit or use her hands or arms for very long, neck and shoulder pain, spasms in her low back and hips, "spells," memory difficulties, vision problems, and a tendency to become ill frequently. Tr. 320. Ms. Revard-Currey said sometimes her left leg began to drag, and she occasionally used a cane. Id. Her right side went into

spasm and her low back became sore when she sat. She referred to
spinal stenosis, and seemed to attribute her shoulder and neck
pain to that. Id. Ms. Revard-Currey reported that the pain was
constant. Id. She said by the end of the day she was tired of
holding her head up, and that her hands and arms were numb most
of the time. Id. She frequently dropped things. Id.

She reported that over the past four months her hands and
head had begun to twitch or "jump." Id. The cause of this had not
been identified. She reported severe pain in her low back and
hips, the cause of which had not been diagnosed, and frequent
limping on the left side. Id. Ms. Revard-Currey indicated that
she had been diagnosed with fibromyalgia or "some sort of
psychological pain disorder that begins with the letter S," or MS
or another neurological disorder. Id.

Ms. Revard-Currey described her "spells" as involving

being perfectly fine and then suddenly having an
electrical sensation throughout her body, leading to
shortness of breath, lightheadedness, and completely
losing her balance. ... She has to lie down at these
times and can be down between two and eight hours.
Also, her "mind isn't very functional" during these
episodes and her speech is slow with some difficulty
enunciating. Spells began in about 1982 although
actually they involved fainting at that time and
occurred several times per week. ... The nature of
these spells ... has never been diagnosed.

Id. She described memory problems beginning in the 1980s and
becoming much worse over the past year. She related that the
cause of the memory problems had never been diagnosed. Id.

Ms. Revard-Currey also described a vision problem in which a pinpoint of light developed in the center of her visual field then extended outward "along the lines of lightning bolts." Id. An extremely bad headache followed. Id. The nature of these visual problems had also never been diagnosed. Id.

Ms. Revard-Currey related that a cold which others were able to function with would "take me all the way down" and that she experienced "spatial disorientation" at these times, such that her balance was "virtually null and void." Id.

Ms. Revard-Currey denied depression and suicidal ideation or attempts. Sleeping difficulties had been resolved after starting Effexor six months previously. Her other medications were Soma, Vicodin, oxycodone, Paxil and ibuprofen. Id.

A brief cognitive screening indicated no disturbances of orientation. Performance was adequate on mental tracking tasks and a brief basic memory task, but calculation was poor. Her fund of general knowledge was good; proverb interpretation was satisfactory; responses to practical judgment issues were good. Tr. 324.

Dr. Trueblood concluded that the psychodiagnostic examination was consistent with somatoform disorder. Id. There were also similarities to hypochondriasis. Tr. 325. However, Dr. Trueblood cautioned:

///

18  - OPINION AND ORDER

It is important to emphasize that diagnosis of any somatoform disorder is made only if a medical cause of symptoms cannot be identified. I was provided with a lot of medical records and note that somatization disorder was apparently at least suggested by Dr. Fohrman. Medical records do refer to diagnoses of fibromyalgia and carpal tunnel syndrome, but these would not seem to nearly account for all of the patient's symptoms. Thus, at present, my impression is that a diagnostic criterion for somatization disorder—that a medical cause has not been identified–is met. However neurological evaluation by Dr. Koller is underway, according to the patient; thus, I believe it is appropriate to await results of Dr. Koller's evaluation before drawing conclusions about a somatization disorder.

                    * * *

I did not identify evidence of significant depression or anxiety. ... I suspect there may be schizoid personality features and possibly paranoid, histrionic, and/or narcissistic features, but there was insufficient time to fully explore these. The patient does emphasize cognitive symptoms. Brief cognitive screening yielded essentially normal results in all areas except calculations which were done very poorly. The cognitive screening results are equivocal regarding whether there is cognitive impairment.

Id. Dr. Trueblood did not believe "the patient malingered on this evaluation, although I am not completely sure about this.... " Tr. 326. Dr. Trueblood's diagnoses were: 1) rule out somatization disorder; 2) rule out hypochondriasis versus conversion disorder; and 3) schizoid personality characteristics. Id.

On January 8, 2001, an MRI of the brain and of the cervical and thoracic spinal cord was normal. Tr. 329. Some disc protrusions were noted, but without mass effect upon the cord. Tr. 330. Significant encroachment was not present. Id.

Ms. Revard-Currey was seen by Dr. Koller on January 15, 2001. Tr. 332. Dr. Koller wrote that her symptoms were "about the same," but "she actually thinks she is getting worse," having to rely more on her cane and "having exquisite pain." Tr. 332. She reported being unable to get enough pain relief with the medications she was getting. Id.

Physical examination, eye examination, test of cranial nerves, and mental status examination were all normal, except for the use of the cane. Dr. Koller wrote:

> Etiology for the patient's complaints not immediately apparent. No clear-cut neurologic illness has been identified. Doubt MS based on ... findings. Will have her proceed with lumbar puncture. ... Suspect that there may be a component of fibromyalgia. At patient's request, will arrange for her to be evaluated by Dr. Depper for an opinion in this regard and therapy as indicated. Explained to the patient there may be little further we can do in terms of diagnosing or treating her...

Tr. 334.

On February 19, 2001, Ms. Revard-Currey was seen by Gary Buchholz, M.D., a neurologist, for evaluation of her pain, possible fibromyalgia, possible MS, balance problems, and somatoform disorder. Tr. 365. He was specifically requested to evaluate her with respect to the 18 tender points used to diagnose fibromyalgia, although Dr. Buchholz noted, "This is not part of a neurological evaluation. Neurologists generally do not diagnose fibromyalgia, which is what this aspect is all about." Id.

Examination was essentially normal except that Dr. Buchholz noted Ms. Revard-Currey had a "very erratic-appearing gait, kind of lurching about," but that she was able to negotiate some stairs. Tr. 367. She used a cane both with walking about the examination room and going up and down the stairs. <u>Id.</u> Sensory examination revealed apparent decreased pinprick diffusely over her face and throughout her body, but there was "no one definitive pattern. It is over most of her arms and legs, sparing the glutei for some reason." <u>Id.</u>

Dr. Buchholz's assessment was as follows:

> The patient appears to have a lot of functional overlay to her examination. There are a lot of giveaway features to her examination. There is no real hard neurological findings. [sic] She does have a lot of subjective pain. It is conceivable that she could fit what is categorized as fibromyalgia, but that is a rheumatological diagnosis. Neurologists generally do not diagnose this condition. I would call this a mild vassal [sic] [myofascial] pain syndrome. I suspect that there is significant psychological factors here. [sic]. I understand that she has had an evaluation by Dr. Trueblood, and I would defer to him with regard to that.

Tr. 368.

On February 6, 2001, Robert Andrews, M.D., wrote a letter noting that Ms. Revard-Currey reported chronic pain involving "just about every area of her body for the past twenty years," and that "[d]iagnostically, the patient has been put through many tests including MRI, CAT scan, EMG, bone scan, LP and these have essentially been unremarkable." Tr. 375. Dr. Andrews said,

"[T]here have been multiple attempts at therapy, including chiropractic manipulation, acupuncture, massage, physical therapy and multiple modalities such as TENS, ice, ultrasound and heat." Id. He described further deterioration in Ms. Revard-Currey's symptoms, saying she was "quite focused on listening to the pain and responds by reducing her activity accordingly." Tr. 376. Dr. Andrews noted that Ms. Revard-Currey had been told to exercise and that she had been on "multiple regimens," including a current one involving occasional weight lifting, but that Ms. Revard-Currey had reported that she "does not walk currently because that will cause the pain to increase," and "[j]ust about any physical activity will make her pain worse, and lying around and doing nothing seems to make the pain better." Id.

Dr. Andrews had observed that Ms. Revard-Currey was able to walk from the car to the clinic, approximately 200 feet, but on a questionnaire, she had responded to a question about how far she was able to walk by indicating that she could only walk about "40 feet on a good day." Id.

Dr. Andrews noted that Ms. Revard-Currey had pain in "just about every part of her body," but no radicular radiation of pain in her extremities, and no neurogenic bowel or bladder symptoms. Id. Further, although she complained of numbness in all four extremities that "waxes and wanes," it was "in a nondermatomal, nonperipheral nerve distribution." Id. "She describes the numbness

that migrates in a peculiar pattern. On some days it will affect the bottom part of her face bilaterally, and on other days it will move to her left arm and on other days her entire trunk." Id. She reported being "weak all over, but not in a focal manner." Id.

Dr. Andrews reported that physical examination revealed "some exaggerated pain behaviors." Tr. 377. She moved about the room with some antalgia, but when distracted, she seemed to move a bit more freely. Id. Her lumbar spine range of motion was "quite good in rotation bilaterally and flexion," but she had some pain behaviors with extension. Id. Cervical range of motion was "quite good in rotation bilaterally," but flexion was limited. Extension seemed to be full. Id. There was no apparent weakness and Ms. Revard Currey had "good facility of movement in all four extremities." There was no tremor. Tone was normal throughout. There was no edema in her lower extremities and no distal atrophy. No fasciculations were detected. Id.

In Dr. Andrews's opinion, Ms. Revard-Currey had what he considered a chronic pain syndrome characterized by diffuse tenderness with features of fibromyalgia syndrome. Tr. 377. He thought it doubtful that her cervical spine stenosis was causing many of her problems. Id. Dr. Andrews said, "She clearly has an exaggerated behavioral response to pain in which she avoids any movement that will increase her discomfort. She does not have an exercise routine that she does regularly but plans to begin

walking soon. Her condition is aggravated by depression, insomnia and deconditioning." Id.

Dr. Andrews recommended that she begin walking every day and that she wean herself off Oxycontin. She was continued on Percocet and given Ambien to counteract the insomnia induced by Wellbutrin. Id.

On February 20, 2001, Paul Rethinger, Ph.D., did a records review on behalf of the Commissioner. Tr. 344-60. In his opinion, Ms. Revard-Currey had somatoform disorder. Tr. 344, 350. He rated her functional limitations as follows: mild restriction of activities of daily living; mild difficulties in maintaining social functioning; moderate difficulty in maintaining concentration, persistence, or pace; moderate limitations in the ability to carry out detailed instructions, maintain attention and concentration for extended periods, and interact appropriately with the general public. Tr. 358-59.

On April 9, 2001, Ms. Revard-Currey was seen again by Dr. Andrews. Tr. 374. She was no longer taking Zanaflex, Effexor, Wellbutrin, Oxycontin, or Percocet; these had been replaced with Ativan, Celebrex, Celexa, and Tegretol, with some Oxycontin as needed for pain. Id. Ms. Revard-Currey reported that she "still feels disabled, as if she cannot work." Id.

She reported pain in her extremities and lower back. The pain was generalized and seemed to flare with increased activity.

She reported walking a mile four days a week with the use of a cane. She was also "in the pool with her mom's MS group about three days a week." Id.

Dr. Andrews wrote that he had spoken to Ms. Revard-Currey about the "importance of maintaining productive employment in society," telling her "I have no reason to feel that she is disabled." Id. Although Dr. Andrews understood that she might have an increase in pain in some situations, "this is something that she will have to problem solve around through pacing, frequent position change, etc." Dr. Andrews wrote that "she does not have a medical condition that would contraindicate her maintaining regular employment." Id.

On April 18, 2001, Ms. Revard-Currey was seen by Joel Depper, M.D. Tr. 369. Ms. Revard-Currey reported chronic pain since the early 1980s, which she attributed to two events. The first, according to her, was an on the job injury "in which she was lifting grosses of paper which may weigh 20-30 pounds. In lifting one of these boxes, she felt pain in her back, and the pain was so severe that she not only was injured, but she went on chronic disability after that period of time." Tr. 369. The second event Ms. Revard-Currey related was moving into an apartment where, "evidently, rat poison had been sprayed the day before, and over the ensuing days, she developed dizzy spells and fainting,

which progressed over a 6 month period of time." Id.[4]

Ms. Revard-Currey related that since January 2000,

> her symptoms have all exacerbated. Her pain has
> become much more severe, associated with insomnia,
> mental confusion, decreased memory, fatigue, and
> waves of what she described as a cold feeling which
> would come into her body, spread upward all the way
> into her head. These spells, which occur a couple of
> times per day, last anywhere from 5-15 minutes, and
> are followed by extreme fatigue.

Id. Her current medication regimen was Zanaflex, 8 mg. three times

------

[4] I note that these two episodes have been described in
conflicting ways by Ms. Revard-Currey. In 1982, she attributed her
back and arm pain to kneeling with 35 pounds on her left arm and
then attempting to straighten up. Tr. 167. In 1983, she told
practitioners at the UCLA Pain center that the back and arm pain
came on gradually over a period of six months. Tr. 172. In 2000,
she told Dr. Koller she was "flinging 50 pound boxes," and felt
"something rip from her tailbone to her neck." Tr. 340. In October
2004, Ms. Revard-Currey told Dr. Carroll her back pain was caused
by slipping and falling backwards onto computers that were behind
her, and from there onto the stairs and eventually onto the floor.
Tr. 657. That same month and year, she told Dr. Lee that she had
injured her back by falling off a ladder at work. Tr. 673. She
claimed on one occasion that she was on disability for two years
after the back injury, tr. 340, and on "chronic disability," tr.
369, but the medical records show that by September 1982, about
five months after the injury, she had returned to working full-
time.

The toxic exposure event was first described as exposure to
chemicals at work, which her employer denied. Tr. 170. She
subsequently described it as exposure to roach poison, tr. 260,
298, or rat poison. Tr. 369. Ms. Revard-Currey said in 1995 that
the toxic exposure caused vertigo and memory loss, tr. 260; in
1999, she said it caused memory loss, numbness, tingling, and gait
disturbance, tr. 298, 513; in 2004, she said it caused convulsions,
muscle weakness, fainting 15-20 times a day, loss of appetite, and
lack of control over her arms and leg. Tr. 654-55. On another
occasion in 2004, she said the toxic exposure caused her difficulty
with memory, balance, and seizures. Tr. 657. She has also claimed
that after the toxic exposure, she was "totally disabled and
partially paralyzed." Tr. 323.

26  - OPINION AND ORDER

a day, Oxycontin, 60 mg. four times a day, Effexor, Zoloft, Vicodin, four to six a day, and Atavan. Id.

Ms. Revard-Currey said her pain was greatest "all over my hands and my entire arm." Id. She said her entire spine, from her neck down into her buttocks, was painful, as well as her legs. Id. She described chronic frontal[5] and neck pain, severe in the morning, increasing as the day went on. Id.

Dr. Depper wrote, "Her affect is unusual, which became evident when I began to examine her. Light touch almost anywhere in her body caused terrible grimacing and shaking of her head, but 15-30 seconds after such maneuvers, she would be smiling, and almost laughing." Id. Musculoskeletal examination was remarkable for "a total absence of arthritis, anywhere." Tr. 370. However, she had extreme tenderness to palpation anywhere on her hands, forearms, upper arms, throughout her spine, into her gluteal muscles, iliotibial band down to her knees, and in her forelegs. Id. Cervical range of motion was full, and she was able to bend forward and touch her toes. Id. Neurologic examination showed that her strength was preserved and deep tendon reflexes were symmetrical. Id.

Dr. Depper concluded,

I spent almost an hour with Denise. I don't have a diagnosis for her. She certainly has diffuse pain. She certainly is fatigued, has headaches and poor

---

[5] I have no way of knowing what frontal pain refers to.

> sleep. However, her subjective symptoms are
> dramatically out of proportion to her physical
> findings, and her affectual response to questioning
> and examination seems inappropriate to the maneuvers
> which were done. I don't have anything to offer her.
> I certainly cannot make a diagnosis. ... We explored
> the various psychological components of her being
> her, and could not identify a stressful factor. ...
> It was hard to identify a toxic factor which may be
> exacerbating her symptoms. I recommended to her that
> she stop her narcotic analgesics.

Id. Ms. Revard-Currey told Dr. Depper she planned on applying for

disability. Id. He told her that "after her evaluation today, it

would be difficult for me to support such an application." Id.

On April 23, 2001, Ms. Revard-Currey called Dr. Andrews's

office to ask him to write a prescription for Oxycontin because

her new primary care physician was not willing to do so. Tr. 579.

Dr. Andrews denied the request. Id.

On March 27, 2002, Ms. Revard-Currey saw Michael Knower,

M.D. Tr. 504. She related a 20-year history of increasingly severe

constant pain involving the back, neck, shoulders, hips, arms,

hands, legs, feet and face. Id. She said that over the last two

months she had been awakening with hands cramped into a "clawed"

position. Id. She also noted that her left arm was weak and

cramping and that she occasionally used a cane. Id. Ms. Revard-

Currey said she had been extensively worked up by Dr. Koller, "who

suspects fibromyalgia." Id.

Examination by Dr. Knower revealed that the neck,

shoulders, arms, forearms, wrists, and hands had full range of

motion and were non-tender. Id. No thoracic or scapular tenderness was found. There was mild lumbar tenderness, but no sacroiliac, quadriceps, hamstrings, knee, soleus or ankle tenderness. Id. Dr. Knower's impression was "probable chronic neuropathic pain, ? etiology." Id.

On March 19, 2002, Ms. Revard-Currey returned to Dr. Koller, after an absence of more than a year and a half. Tr. 564. She came for complaints of neck pain, headaches, arm and hand numbness, hand cramping, and low back pain "that is at times excruciating," spreading from one posterior iliac to the other and into the buttocks. Id. Although Ms. Revard-Currey did not describe weakness or numbness in the legs, she did say that she had to use a cane with walking for a "combination of loss of balance and difficulty making her legs work properly." Id. She also reported "tremendous fatigue," and short-term memory difficulties. Id.

Ms. Revard-Currey told Dr. Koller she had been walking, doing yoga, receiving acupuncture, and taking herbal remedies, along with ibuprofen, Allegra, and Wellbutrin. Id. Physical examination was within normal limits. Tr. 565-66. Dr. Koller noted that a lumbar puncture had been normal and that previous MRIs of the brain and spinal cord were unremarkable. Id. See also tr. 568. He also noted that Dr. Depper had been "unable to make a definitive diagnosis" of fibromyalgia. Tr. 566.

///

Dr. Koller concluded:

Her neurologic exam remains quite unremarkable. The etiology of the patient's complaints is not immediately apparent. Clearly I don't believe she suffers from a neurologic illness. I find no evidence to support a diagnosis of MS, I don't suspect brain tumor, stroke or any sort of neurodegenerative condition. I do think that fibromyalgia and/or chronic fatigue could play a role in her complaints, but ... that is not my area of expertise.

Id.

Ms. Revard-Currey was seen again by Dr. Knower on April 24, 2002. Tr. 503. Ms. Revard-Currey reported, on "further reflection and observation," noted that her most troublesome symptoms were pain and an "electrical sensation" involving the face, head and trunk. Id. The second most troublesome symptom was a "deep internal pain" with prolonged pressure in various parts of her body. Id. She said she was unable to sleep for more than an hour at a time because of diffuse, intense muscle cramps. She asked about Tylenol #3 for breakthrough pain. Id. She said she had found no improvement in her symptoms with previous trials of antidepressants for chronic pain, but did note some improvement while on Wellbutrin, which had been discontinued because of vertigo. Id. Dr. Knower thought the pain was "most suggestive of fibromyalgia, although with inconsistent features." Tr. 502. She was started on Zanaflex and nortriptyline and placed back on Wellbutrin, but not given Tylenol #3. Id.

///

Dr. Knower saw Ms. Revard-Currey again on May 8, 2002. Tr. 501. She reported significant improvement in her ability to sleep, but a re-emergence of "pain everywhere." Id. She requested "something to kill the pain" for the present and future flares. Id. She said she was not currently walking, even with canes, because of "excruciating pain." Id.

On examination, her back showed diffuse mild irreproducible "touchy tenderness," but the right SI joint showed consistently reproducible exquisite tenderness. Id. She was given a trigger point injection in the right SI joint, and after 20 minutes, she noted significant improvement. Dr. Knower noted that her gait was "minimally antalgic." Id. She was continued on Wellbutrin, nortriptyline and Zanaflex, and advised to engage in daily low impact exercise. Id.

On May 13, 2002, Ms. Revard-Currey reported marked improvement of the right SI joint, but said she still had pain in her leg, exacerbated when she moved. Id. Dr. Knower noted that she "sits and stands without difficulty," but did have some difficulty raising her leg and internally rotating her hip. An area of exquisite tenderness was found in the hip along the leg crease, and that area was injected with Lidocaine/Marcaine and prednisone. This gave "marked relief of the pain in a matter of minutes." She was then able to extend and flex the hip and rotate the leg

///

31  - OPINION AND ORDER

internally and externally. Id. She was advised to continue with Zanaflex, exercises and physical therapy. Id.

On June 12, 2002, Ms. Revard-Currey was again seen by Dr. Knower. Tr. 499. She continued to note a "grabbing" pain in the left hip, and pain in the shoulder that had resolved after two days. Id. She reported that physical therapy was helpful, and that she was getting into a pool three times a week, with range of motion and endurance steadily improving. Id. She said she was also working in her yard for the first time in 10 months and walking on a daily basis, using her cane less. Dr. Knower wrote, "Is enjoying 'feeling normal again' for the first time in years." Id. Dr. Knower wrote, "Chronic pain due to fibromyalgia like condition continuing to improve." Id. At that time her chief complaint was "emotional soreness." As a result, she was still not up to returning to work. Id.

On July 24, 2002, Dr. Knower wrote that Ms. Revard-Currey was complaining of burning pain across the iliac crests and buttocks, radiating down to the trochanters bilaterally, headaches, and a "kicked in the chest" sensation. Tr. 498. However, she noted that the severity of these symptoms was tolerable. Id. Physical examination of the back showed no tenderness. Id.

On August 13, 2002, Dr. Knower wrote that Ms. Revard-Currey was complaining of sharp pains radiating across the buttocks and

down the legs, improved with increased Effexor and "nothing like they were." Tr. 562. She also related a long-standing history of "spells" in which she "blacks out," then sleeps for periods up to several hours. Id. She said she could often feel them coming on and proceed to bed. Id. She said previous neurological evaluations, including EEGs, had not produced a definitive diagnosis. Id.

On September 18, 2002, Dr. Knower wrote that Ms. Revard-Currey was still complaining of burning pain across the left buttock and down the left leg, but much better controlled than six months previously. Tr. 558. She reported continuing with exercise and stretching programs and "getting lots of gardening done." Id.

On October 1, 2002, and again on October 28, 2002, Dr. Knower injected her with Lidocaine/Marcaine in the left and right sacroiliac joints. Tr. 556, 555. Ms. Revard-Currey reported pain relief within minutes. Id.

On October 28, 2002, Ms. Revard-Currey told Dr. Knower she was unable to lie down more than 2 1/2 hours at a time without getting up and changing position. Tr. 553. Hydrocodone gave her only minimal pain relief. Id. She was no longer swimming or receiving physical therapy, although until a week earlier, she had been walking 30 to 40 minutes a day and exercising on her weight bench. Id. She continued to use a hot tub followed by yoga or a similar stretching routine. Id. Dr. Knower wrote, "Fibromyalgia

like syndrome with recent flare. Functional status is still much better than on first visit 7 months ago." Id.

On December 13, 2002, Ms. Revard-Currey was seen by Dr. Knower for "multiple complaints of decompensation," which Ms. Revard-Currey referred to as "spells." Tr. 551. Ms. Revard-Currey stated that "these date back to a toxic exposure 20-25 years ago while living in Southern California. Underwent extensive cardiology and neurology workup at UCLA ... No etiology ever determined." Id. She described the spells as beginning with a "'cold feeling' of unreality in the chest, followed by slurred speech and degeneration of her handwriting to a crude, 'childish' level, followed by 'passing out' more suggestive of somnolence than loss of consciousness for 4-5 hours." Id. She said the spells "always occur during the day," but had no relationship to meals, posture, or activity level, although they seemed to be "somewhat likely when she is ill or fatigued." Id.

Ms. Revard-Currey said the spells had historically occurred every two to four weeks, but that they had recently increased to at least one per week. Id. Dr. Knower wrote, "She is also distressed that she no longer has the prodromal 'cold feeling' and dysarthria, but will begin to 'pass out' almost immediately with onset." Id.

She continued to complain of recurrent increasing burning pain in the hips, left greater than right. Id. She also complained

34  - OPINION AND ORDER

of sharp cervical occipital pain, stiffness and soreness in the neck and fingers "not working." <u>Id.</u> She reported requiring a cane for ambulation. <u>Id.</u>

At that time, Dr. Knower's diagnostic impressions were chronic pain, sciatica, and/or fibromyalgia syndrome with somatization component. Tr. 552. "'Spells' uncertain etiology. The patient raises concern of MS. Would consider seizure versus pseudoseizure versus anxiety attack." <u>Id.</u> Dr. Knower wrote, "Obtain previous records from Dr. Koller. Repeat MRI. Reviewed historical inconsistencies with patient." <u>Id.</u>

On January 2, 2003, Ms. Revard-Currey complained of pain in the neck and low back, legs, arms and "multiple places." Tr. 549. She requested injections and was given them in the base of the neck and the SI joint. <u>Id.</u> She was advised to remain active and to continue to attempt to work. <u>Id.</u>

Dr. Knower saw Ms. Revard-Currey again on March 26, 2003. Tr. 546. She reported that she had "generally been doing well," including working at a job at Subway until she "cramped up" at work. Tr. 546. She was currently applying at Wal-Mart. <u>Id.</u> She reported tingling and deep aching across the right scapula, radiating down the arm, over the last six weeks. <u>Id.</u> However, she had begun conditioning with a Pilates exercise program. <u>Id.</u>

On examination, there was point tenderness of the right suprascapularis tendon at the acromial margin. <u>Id.</u> The trigger

point was injected with Lidocaine/Marcaine and she was counseled about conditioning. Id.

A chart note dated April 2, 2003, says that Ms. Revard-Currey reported right shoulder and right arm pain were significantly improved after an injection, but that the pain worsened significantly a few days earlier when she attempted to lift a 50-pound bag of dog food. Tr. 545. After a trigger point injection, she showed full right shoulder range of motion without pain. Id. On April 15, 2002, she reported to Dr. Knower that her chronic pain was generally well controlled. Id. She also reported nearly constant headaches. Id.

On June 6, 2003, she was seen by Dr. Knower for neck stiffness and spasm with secondary headaches, deep aching pain and numbness in the arms, pain in the sacroiliac joint radiating down to the level of the ankles.  Tr. 543. Dr. Knower discussed a Bupropion/Venlafaxine/Topamax regimen for myofascial pain. Tr. 542. Dr. Knower also counseled her about the continued use of hydrocodone and recommended that she accelerate her exercise program as tolerated. Id.

On July 30, 2003, Dr. Knower wrote a letter to Ms. Revard-Currey's attorney. Tr. 641. He stated that she exhibited two distinct patterns of chronic pain. The first was sciatica and ongoing pain in the left hip and left thigh, caused in part by nerve root compression as a result of degenerative disc disease

at L3-L4 and L4-L5 and C3-C4 through C6-C7. In Dr. Knower's opinion, flattening of the spinal cord[6] could account for her "drop attacks" in which she suddenly lost sensation and strength in both legs. Id. Dr. Knower attributed Ms. Revard-Currey's pain and trigger point tenderness in the shoulders, arms, back, hips and legs to a "fibromyalgia-like syndrome," because the pain did not have "all the classic features of fibromyalgia." Id.

In addition to physical pain, Dr. Knower thought she also had chronic anxiety and depression, causing sleep disturbances, mood swings, and difficulties with short term memory, concentration, calculation, and other analytical thinking. Id. In Dr. Knower's opinion,

> With her degenerative disc disease, sciatica, fibromyalgia-like syndrome, anxiety and depression, Denise would be unable to work on a sustained, regular basis. She is generally unable to sit or stand in any single position. When I see her in the office she will almost always be squirming continuously trying to find a position of comfort. Her "good spells" and "bad spells" generally run in 2-4 week cycles, however, she has had "bad spells" lasting 2-6 months. During her "good spells" she will be able to sleep reasonably well for 2-3 nights out of the week. During her "bad spells" she will obtain at most 2-3 hours of sleep in the course of the night. I do not think Denise would be capable of working a full 8 hour day. Even at her best I would anticipate at least 2 days of absence in a week. She could potentially go weeks to months without working at all.
>
> Denise is currently on ibuprofen (an anti-

---

[6] This strange medical terminology is nowhere explained by Dr. Knower. He most likely refers to nerve roots being pinched.

> inflammatory), Wellbutrin, Effexor (anti-depressant),
> and Methadone (an opioid "narcotic") for pain
> management. She has also taken Zanaflex (a muscle
> relaxant) periodically for muscle spasm and nerve
> pain. Methadone, Zanaflex and Effexor may all cause
> drowsiness if dosages must be pushed to control
> accelerating pain.
>                          * * *
> As mentioned above, Denise has difficulty sitting or
> standing in any given position for any length of
> time. Her gait is often unsteady and she usually
> walks with a cane.

Tr. 642-43.

On March 24, 2004, Dr. Buchholz wrote a letter to Dr. Knower summarizing a recent evaluation of Ms. Revard-Currey. Tr. 654. Dr. Buchholz noted that he had seen Ms. Revard-Currey once before, in 2001, and that he had ruled out MS. Id. Dr. Buchholz stated that at that time, Ms. Revard-Currey had "a lot of subjective symptoms of giveaway weakness," and that although she could "conceivably" have fibromyalgia, he did not think she had a rheumatologic process. Id. In Dr. Buchholz's opinion, there were "significant psychological factors at that time." Id.

Dr. Buchholz noted that Ms. Revard-Currey's current complaint was recurrent seizures, which she dated back to the time she had moved into a house that had been fumigated for roaches. Id. Dr. Buchholz said Ms. Revard-Currey described the seizures as a "surreal feeling or a feeling of faintness and weakness and then goes out and jerks." Id. Ms. Revard-Currey did not know how long

///

she was out. She also reported "recurrent fainting spells," which came and went. Id.

According to Ms. Revard-Currey, the seizures had "started in waves" six months previously and lasted two to three minutes. Id. Afterwards, she was exhausted, but there was no tongue biting or urinary incontinence. Id. She said they had never occurred without warning, so that she could continue to drive. Id.

Ms. Revard-Currey said she had also had episodes, five times in the last two to three weeks, in which her vision went to negative, "meaning it is like looking at a negative of a film." Id. These episodes lasted up to three or four minutes. Id.

In addition, she reported that her muscles had been growing progressively weaker over the past four years, with cramps in the arms and legs, although Zanaflex was helping her. Id. She also claimed a "near constant extreme headache," along with memory deficits, double vision "one to two times on a good day with 48 hours[7] duration if this is on a bad day" and fainting spells. Tr. 654-55.

Ms. Revard-Currey told Dr. Buchholz that 20 years earlier, she had been "fainting 10 to 15 times a day, [and] lost control of her arms and leg," for which she was evaluated at UCLA. Tr. 655. Dr. Buchholz noted, "She is vague on what occurred." Id. Her

---

[7] What this means is hard to discern. When a "bad day" starts and stops is impossible to know.

fainting spells eventually stopped, but Ms. Revard-Currey said
that in 1995 she began developing severe long-term memory loss,
an ongoing problem. Id.

Ms. Revard-Currey also claimed "staring spells," and said
when she thought about doing something, she "cannot make herself
do it. She just sits there staring at whatever catches her eye."
Id. She also claimed frequent deja vu, followed by an icy cold
feeling in her chest. Id. She would "pass out for a time and be
exhausted." Id.

A physical examination conducted by Dr. Buchholz was
normal. Tr. 655-56. Dr. Buchholz wrote:

> It is hard what to make of all this. ... It is hard
> to believe all this could be related to any toxic
> exposure, and she has had major workups in the past
> without significant findings ... through many years
> and also down at UCLA. I suspect there is a huge
> psychogenic component to all of this.

Tr. 656.

On April 8, 2004, Dr. Buchholz saw Ms. Revard-Currey again.
Tr. 653. In a chart note copied to Dr. Knower, he noted that an
EEG was "quite normal." Id. Ms. Revard-Currey discussed her
concerns about memory and overall cognitive function, her hands
going to sleep, her legs and feet being numb since the 1980s, and
a new problem of "her legs freezing leading to shaking, then they
will jerk out, and she will land on her buttocks." Id. She talked
about lumbar pain as well. Id. Dr. Buchholz said,

> It is not totally clear what the answer is here, but I think that we will go back to revisit nerve conduction studies. ... Perhaps there is still not much to find. ... In spite of what she has called seizure in her description, she does not think that she has epilepsy and does not want to proceed further. My index of suspicion that she really has seizures is low enough that I tend to agree, and I do not feel strongly about further testing in that direction.

Id.

On April 14, 2004, Dr. Buchholz did extensive nerve conduction studies. Tr. 652. Ms. Revard-Currey did have evidence of carpal tunnel syndrome that was "fairly severe bilaterally." Id. Lower extremity nerve conduction studies were "all quite normal." Id. She declined to get wrist splints and in Dr. Buchholz's opinion, she was not ready for carpal tunnel release surgery. Id.

On July 8, 2004, Ms. Revard-Currey returned to Dr. Buchholz. Tr. 651. He noted that a lumbar spine MRI showed some "fairly significant stenosis at L3-4 and L4-5. In addition, Dr. Buchholz did a needle EMG on both lower extremities. Id. He could not find any evidence of denervation. Dr. Buchholz wrote, "[S]he has enough ongoing pain and lumbar stenosis to warrant a neurosurgical evaluation. Perhaps epidural steroids would be appropriate." Id.

On October 5, 2004, Ms. Revard-Currey was seen by Linda R. Carroll, M.D.. Tr. 657. Ms. Revard-Currey told Dr. Carroll she traced her symptoms back to a work related injury in 1982. Id. Ms.

41  - OPINION AND ORDER

Revard-Currey related that while she was "loading some tapes, she slipped on some steps and fell backwards onto the computers behind her and also onto the steps, which she was ascending. She eventually fell onto the floor." Tr. 657.

Ms. Revard-Currey reported difficulty with memory, balance, and seizures, all of which she attributed to being exposed to an "industrial strength pesticide" upon moving into an apartment in Los Angeles. Id. Ms. Revard-Currey reported pain, constant headaches, and legs that "do not work." Her symptoms were aggravated by walking, driving, prolonged sitting, standing, bending, twisting, and turning. Id. She used exercise and a hot tub for relief, and said she had also been given five 500-mg. tablets of hydrocodone by Dr. Knower. Id. Ms. Revard-Currey said these were "not strong enough." Id. Ms. Revard-Currey stated that Dr. Knower "thinks that she is an alcoholic," but that liver damage diagnosed through lab work was the result of pesticide exposure, not alcoholism. Id.

Ms. Revard-Currey said she was able to perform all activities of daily living, but could stand for only a couple of minutes. Id. She could sit for two hours if she changed positions frequently. Id. On good days, she could walk around the block; on bad days she could barely make it to the grocery store. Id. She described her sleep as "horrible," awakening several times during the night with pain. Id.

Her current medications were Wellbutrin, Effexor, Topamax, and Vicodin. Tr. 658. She denied blurred vision, double vision, chest pain, high blood pressure, irregular heartbeat, diabetes or thyroid disease. Id. Physical examination showed no antalgia or limp, and the ability to take a few steps on toes and heels. Id. No postural abnormalities were seen. Neck range of motion was within functional limits, and she was able to forward flex with fingertips reaching the mid-tibia and no tortuous recovery. Id. Back extension with overpressure was positive for reproduction of lumbosacral pain. Muscle tone and bulk were normal in the extremities and range of motion was within normal limits. Id. Neurologic examination was normal. Sensation showed subjective decreased light touch in the upper extremities. Id. A hip compression test was positive for reproduction of hip pain on the right and back pain on the left. Tr. 659. There was tenderness to palpation over the sacrum, lumbosacral junction, sacral margins, and greater trochanters. Id.

Dr. Carroll's diagnosis was chronic pain syndrome, etiology unknown. Id. She concluded:

> No significant neurologic deficit on today's examination to suggest an acute neuropathic problem. Unfortunately, I have no prior records at all to try to discern the etiology of Denise's symptoms. I told her that I would not provide her with any medications until and unless I had reviewed prior records.

Id.

43  - OPINION AND ORDER

On October 29, 2004, Ms. Revard-Currey saw Gilbert Lee, M.D. Tr. 673. She reported that she had separated from her husband, who had obtained a restraining order. Id. Dr. Lee wrote that Ms. Revard-Currey had been in the emergency room after a hypotensive episode and "chronically too much NSAID." Id.

Ms. Revard-Currey was, according to Dr. Lee, "pretty negative regarding Oregon physicians and chronic pain management. She repeatedly informs me that no one will manage her pain so she just doesn't try. ... She dismisses all surgical approaches for her chronic pain." Tr. 673-74. Ms. Revard-Currey stated that for exercise, she does yoga and stretching and walking on a treadmill.[8] Tr. 674.

She reported psychological abuse by her husband and a "long history of psychological abuse" from her parents. Tr. 674.

Her symptoms included blurred vision, tinnitus, fainting, blackouts, tingling in the arms and legs, headaches, chest pain, palpitations, chest tightness, joint swelling, fatigue, stiffness and pain in the neck, low back, arms, and legs, depression, anxiety, insomnia, and relationship abuse. Tr. 674.

Physical examination was unremarkable except that her entire back was "diffusely spasmed and tender to painful." Id. But there were no trigger points of fibromyalgia elsewhere. Id. Ms.

---

[8] Compare to her October 5, 2004 statement to Dr. Carroll. Tr. 657.

Revard-Currey agreed to bring medical records for Dr. Lee to review at her next visit. Tr. 675.

On November 15, 2004, Dr. Lee offered Ms. Revard-Currey methadone for chronic pain control, but she responded that in the past it had not helped her much, whereas Vicodin was helpful. Tr. 669. Dr. Lee prescribed Vicodin. Id. On November 19, 2004, a chart note indicates that Ms. Revard-Currey called to report she felt "better now than she has in months," and that she slept five hours the night before, "which is more than she has in months and is feeling great." Tr. 668.

On December 13, 2004, Ms. Revard-Currey returned to Dr. Lee. Tr. 665. She said epidural injections had failed and she was unwilling to have surgery. Tr. 666. Ms. Revard-Currey said she had seen Dr. Fohrman, who "felt she had too many trigger point areas to believe she has fibromyalgia." Id.

Ms. Revard-Currey said the Vicodin had "taken a slight edge off but hasn't really helped." Id. Dr. Lee wrote:

> She would do well to have a multidiscipline pain clinic approach to her chronic pain syndrome. She really needs Psychiatrist, Neurologist, Rheumatologist, Neurosurgery, Physical Therapist, Occupational Therapist, and Social Services. Need to exclude certain things with lab tests that are current. She is most likely not "fixable" but she has not been through an intense evaluation because she can't get places and she has no finances.

///

Tr. 667. Dr. Lee prescribed Elavil to "help her sleep better and do better with the pain," and renewed the Vicodin prescription. Id.

On January 10, 2005, Dr. Lee noted that Ms. Revard-Currey reported a telephone altercation with her husband, after which her husband called the police. Tr. 663. She said a policeman entered her apartment, refused to allow her to get dressed, grabbed her by the arms and hair, dragged her to his car, and smashed her against the car. Dr. Lee wrote, "She is a past violent rape victim and her response was to kick him in the groin when he would not stop being abusive. His response was to slug her in the face causing her to lose consciousness." Id. She developed bruises from the altercation. She complained of increased pain and spinal stiffness and facet popping with movement. Tr. 664. She requested Zanaflex and Vicodin. Id. Dr. Lee wrote,

> The above story is from the patient and I have made
> no effort to collaborate it. I am disappointed she
> did not start the Elavil and is off hormones again.
> I can change the hormones to Estrace, which
> generically is the cheapest estrogen replacement. I
> refused Zanaflex in part due to its expense and in
> part I do not wish to escalate her pharmacopeia. She
> wanted more documentation for Disability
> Determinations, which denied her case. After she left
> I reviewed her MRI report and her chart and see
> nothing more to do other than undergoing independent
> medical examinations with neurologist, orthopedist,
> and psychiatrist.

Id.

///

In a chart note dated February 1, 2005, Dr. Lee noted "multiple sessions over the last month related to patient requesting x-rays of her jaw in order to prove police brutality. She was upset with me as I would not order them as they were not medically necessary." Tr. 661. Dr. Lee wrote,

> Patient is requesting Zanaflex 4 mg tabs with 4 tabs at night and 3 tabs in morning. Again she is upset at me for telling her that she is requesting too high of a dose for my comfort. I would be willing to do 2 tab BID. It is 10 days too early to renew her Vicodin. She is out, but I refused to renew her prescription until the 10th.

Tr. 661.

Dr. Lee noted that Ms. Revard-Currey reported chronic pain "close to fibromyalgia but she hurts everywhere and not just trigger point areas. Exacerbated by her underlying mental disorder that makes it very difficult for me to want to continue a physician-patient relationship." Tr. 662. On March 17, 2005, Dr. Lee terminated treatment. Tr. 660.

### Hearing Testimony

At the hearing in July 2003, Ms. Revard-Currey said she was not currently seeing anyone for mental health treatment, having terminated treatment with a nurse practitioner, Sue Bassett, in November of the previous year. Tr. 692. For medical care, she was seeing Dr. Knower. Tr. 693-94. She was also seeing an acupuncturist. Tr. 694.

///

Ms. Revard-Currey testified that she had seizures up to three or four times a week. Asked how they affected her, she said, "They come on and my mind goes out. My body gets real weak. I become completely disconnected, and then I have to lay down, because I immediately go to sleep for hours and hours afterwards." Tr. 695. She characterized these seizures as "mostly internal," except for "an icicle feeling throughout my body," explaining that she did not have epileptic seizures, "but I can't function, at all." Tr. 696. After one of these seizures, she is not functional until eight to twelve hours later. Id.

Ms. Revard-Currey said she had pain everywhere in her body. Tr. 696. The most severe pain was in her shoulders, back, neck, hips, and down the back of her legs. Id. The pain was constant. Tr. 697. She said she could not walk far because her hips and legs started to hurt. Id. Sometimes she was unable to feel her feet, and "then I fall down a lot." Id. She described the pain in her hips and legs as "like somebody's got a knife in me and they're just turning it." Tr. 697. She said her shoulders and her left arm and leg "spasm quite a bit," which she described as "like a deep, deep ache right in your bones." Tr. 697. The pain was made worse by such activities as walking, bathing one of her dogs, or cooking. She said when she cooked, she had to hold the pans with both hands. Standing and cooking a meal was painful, and the spasms and fatigue were "so great that I just can't stand anymore,

48  - OPINION AND ORDER

so I'll fall over." Tr. 697-98.

Ms. Revard-Currey said she had severe mood swings, saying, "pretty much everybody in Redmond has been told off by me, at one point or another." Tr. 700. She said she was unable to sleep for more than three to five hours at night because she was constantly waking up to change positions. Tr. 702. She had previously been treated for insomnia, but was not currently taking medication for it. Id.

Ms. Revard-Currey described problems with her memory, saying she could not remember the events of her life: "I can't even remember getting married. It's like I know there's something out there that I've done, but I have no recollection of ... having done it. ... I listen to people talk about their childhood. And I just think, 'My God, wouldn't it be nice to know what I was like then.' But I have no memory of it." Tr. 703-04. She related that her husband "says I broke the bathroom door. And ... it is broken, very severely. But I don't remember doing that." Tr. 706. In spite of her history of memory problems, Ms. Revard-Currey said she had actually done "fairly well" during the year that she was a full-time college student, although she was unable to work at her part-time job five full days in a row. Tr. 704. Ms. Revard-Currey said she also suffered from vertigo. Tr. 705.

Her current medications included Wellbutrin and Effexor for depression, Zanaflex and Flexeril for muscle spasms, hydrocodone,

Xanax for anxiety, Alprazolam, a breathing medication, Lisinopril and nadolol for blood pressure, and Activella, for hormone replacement. Tr. 707-710.

Ms. Revard-Currey told the ALJ that on the morning of the hearing, it took her 12 minutes to get out of bed. Tr. 711. She said that at other times,

> I can't feel my legs. And my back is excruciating in the morning... And I do fall down sometimes. My legs just go right out from under me and I fall down.

Tr. 711. She described a typical day as sitting on the couch for a couple of hours, with pillows to support her lower back and shoulders and her feet on an ottoman, "while I wait for things to start moving." Id. "[T]he left side is real bad with spasms and they just jump all over the place." Tr. 712. She said she then went out to the deck and walked outside for a distance of about 15 feet before returning to the house and sitting again until her husband came home from work. Tr. 712. After her husband came home, she watched TV. Id. She said she did very little housework, id., and that her husband did most of the cooking. Tr. 698. She testified, "A salad is about all I do." Id.

Ms. Revard-Currey said she was able to stand in one place for only about one minute, because her legs were so weak that she felt she was going to fall down. Tr. 713. Sitting was also uncomfortable. Id. She said she could walk only about 10 to 15

feet without resting. Id.[9] When she tried to walk, her legs went numb and she fell. Tr. 714. It also hurt to move her neck. Id. The numbness in her fingers prevented her from talking on the telephone, holding a book to read, fastening buttons or zippers, and picking up small things. Id.

George Currey, Ms. Revard-Currey's husband, testified. He said it took Ms. Revard-Currey "a while to get moving" in the morning. Tr. 722. In the evening, "mostly it's just sit around and watch TV until it's time for bed." Tr. 723. He said sometimes Ms. Revard-Currey was up late at night, and other times she slept all day. Id. He explained the incident with the broken bathroom door by saying that he came from work and found the bathroom door broken. Id. He asked Ms. Revard-Currey what happened, and "She said she fell against the door, but she couldn't remember doing it." Id. He said she had called him twice to say she was experiencing vertigo while driving and was "going to sit on the side of the road and wait for it to ... go away." Tr. 724. He could not say how often she got vertigo, because "she might not have any for a month," but she might also "have three or four in a week." Tr. 725. He said, "There doesn't seem to be any logical progression on it. She just has them." Id. Mr. Currey said he observed her in pain on a daily basis, and had also seen her

---

[9] Post-hearing records show that she walks around the block or to the grocery store, and uses a treadmill. Tr. 657, 674.

"continually shaking her hands, because ... they're asleep." Tr. 725.

Mr. Currey said Ms. Revard-Currey had obtained a job at Children's Orthopedic Hospital, but was fired after she got into a disagreement with a parking lot attendant. Tr. 726. He also described a job where Ms. Revard-Currey was working part-time and "they had talked to her about going full-time," tr. 727, but "all of a sudden they cut her loose." Id.

Mr. Currey said he does the vacuuming, while Ms. Revard-Currey does the laundry. Tr. 728. He said his wife cooks breakfast, and that each of them cooks dinner at times. Tr. 729. He has seen her drop frying pans. Id.

The ME, Dr. Dragovich, opined that Ms. Revard-Currey's primary diagnosis was undifferentiated somatoform disorder, listed in the Social Security regulations at 20 C.F.R. Part 404, Subpart P, Appendix 1 § 12.07.[10] Tr. 734. Dr. Dragovich thought there were

---

[10]The listings set out at 20 CFR pt. 404, subpt. P, App. 1 are "descriptions of various physical and mental illnesses and abnormalities, most of which are categorized by the body system they affect." Sullivan v. Zebley, 493 U.S. 521, 529-30 (1990). Each listed impairment is "defined in terms of several specific medical signs, symptoms, or laboratory test results." Id. at 530. For a claimant to show that his impairment matches one of those listed, the impairment must meet all of the specified medical criteria. Id. An impairment which manifests some but not all of these criteria, no matter how severely, does not qualify. Id., citing Social Security Ruling (SSR) 82-19, Dept. of Health and Human Services Rulings 90 (Jan. 1983)("An impairment 'meets' a listed condition ... only when it manifests the specific findings described in the set of medical criteria for that listed impairment.") The level of severity for a particular listed impairment is defined by the set

some indications of a personality disorder as well, id. at §
12.08, but that these were "clouded by the issue of narcotics,"
tr. 734, i.e., whether Ms. Revard-Currey had taken them as
prescribed or overused them, and "how her mood varies with some
of the medications." Id. Because of the effect of the narcotics,
Dr. Dragovich did not diagnose a personality disorder because the
evidence was not strong enough. Id. She thought Ms. Revard-Currey
had an affective disorder that was controlled. Tr. 735.

In Dr. Dragovich's opinion, Ms. Revard-Currey's mental
impairments did not meet or equal the listed impairments because
the evidence did not support the necessary severity findings.[11] In
Dr. Dragovich's opinion, Ms. Revard-Currey's activities of daily
living were only mildly limited, her social functioning was
moderately limited, and disruptions in concentration and attention
would be moderate, without evidence of deterioration or
decompensation. Tr. 735-36. Dr. Dragovich thought Ms. Revard-
Currey's mental impairments did not meet or equal any of the
listings. Tr. 736.

///

_____

of findings in the list. Zebley 493 U.S. at 530-31.

[11] To be disabling, a somatoform disorder must result in at
least two of the following: 1) marked restriction of activities of
daily living; 2) marked difficulties in maintaining social
functioning; 3) marked difficulties in maintaining concentration,
persistence, or pace; or 4) repeated episodes of decompensation,
each of extended duration. 20 C.F.R. Part 404, subpart P, App. 1,
§ 12.07(B)(1-4).

A vocational expert (VE), Eileen Linicome, also testified. The ALJ asked her to consider a hypothetical individual who was moderately limited in concentration, persistence and pace, and who had difficulty getting along with co-workers. Tr. 740. The VE testified that such a person could do Ms. Revard-Currey's past relevant work as an insurance checker. Tr. 741-42.

### ALJ's Decision

The ALJ noted in his decision that Ms. Revard-Currey's alleged impairments included limited use of her hands and arms, difficulty concentrating, loss of balance, inability to sit or stand for extended periods, infrequent "spells," chronic pain, continuous headaches, difficulty swallowing both liquids and solids, spasms in her low back and hips, vision problems, a tendency to become ill frequently, occasional dragging of her left leg, seizures preceded by a cold feeling throughout her body and followed by the need to rest for 6 to 12 hours, inability to feel her feet which caused her to fall, spasms in her shoulders, left arm and legs, and a deep ache in her bones. Tr. 28-29.

The ALJ acknowledged Dr. Knower's opinion that Ms. Revard-Currey would be unable to work on a sustained, regular basis due to fibromyalgia-like syndrome, degenerative disc disease in the lumbar spine with sciatica, cervical spine problems, and anxiety/depression. Tr. 29. The ALJ rejected this opinion on the ground that Dr. Knower did not "appear to be aware of his

colleagues' extensive evaluations," or of "numerous other medical sources of record suggest[ing] that the claimant has chronic pain and a somatic disorder." Id. The ALJ cited Dr. Andrews's opinion that Ms. Revard-Currey did not have a medical condition that would contraindicate her maintaining regular employment, based on extensive diagnostic tests including MRIs, CAT scans, EMGs, bone scans, LP and other tests, the results of which were essentially unremarkable. Id. The ALJ also accepted Dr. Andrews's opinion-- contradicting the opinion of Dr. Knower--that it was doubtful cervical spine stenosis was causing her problems, and that she "clearly has an exaggerated behavioral response to pain," indicating that her problems were cognitive and emotional. Id.

The ALJ also relied on the opinion of Dr. Trueblood that Ms. Revard-Currey had somatoform disorder, consistent with her report of a wide variety of symptoms, her presentation of the symptoms in a "somewhat colorful and dramatic way," which at times seemed inconsistent, and then modifying her reports upon further inquiry. Tr. 30. The ALJ accepted Dr. Trueblood's opinion that the diagnostic criteria for a somatization disorder were met, in the absence of a medical cause for Ms. Revard-Currey's symptoms. The ALJ accepted the opinions that the diagnoses of a fibromyalgia- like syndrome and carpal tunnel syndrome would not account for all of Ms. Revard-Currey's symptoms.

///

The ALJ also accepted the opinion of neurologist Dr. Modell, who concluded that there was no evidence of a generalized peripheral neuropathy or evidence of MS. Id. The ALJ referred to MRIs of the brain and cervical and thoracic spinal cord in October 1999 and January 2001 that were normal. Id.

The ALJ cited Dr. Knower's opinion that Ms. Revard-Currey did not have the classic features of fibromyalgia and his diagnosis of a fibromyalgia-like syndrome. The ALJ found that although Dr. Knower referred to a May 2002 x-ray of Ms. Revard-Currey's lower back showing degenerative disc disease, which would account for her left hip symptoms, "nowhere in this treating physician's numerous progress notes has he indicated that he took an x-ray of the claimant's lower back in 2002 or that he has talked to anyone who did at that time or thereafter." Id. Additionally, the ALJ found, none of Dr. Knower's notes in 2002 and 2003 include any references to degenerative disc disease, although "he did note a somatization component possibility on December 13, 2002." Id.

The ALJ rejected Dr. Knower's opinion in the letter of July 30, 2003 that degenerative changes to the cervical spine were pinching the nerve roots and flattening the spine, which would account for at least part of her upper extremity symptomatology. Dr. Knower had supported this statement with a December 2002 MRI of the neck, but "again, his progress notes do not support his ...

summary conclusions," since Dr. Knower's records did not indicate

that Ms. Revard-Currey underwent an MRI in December 2002. Tr. 31.

The ALJ noted that on December 13, 2002, Dr. Knower had said Ms.

Revard-Currey's extensive cardiology and neurology workups,

including MRI scans and EEGs, <u>did not</u> indicate an etiology for her

complaints. The ALJ concluded,

> It appears that Dr. Knower erroneously thought there
> had been a December 2002 MRI and erroneously
> concluded that it had demonstrated an etiology for
> the claimant's upper extremity symptoms. Dr. Knower
> reports that a May 2002 x-ray of the claimant's lower
> back showed degenerative disc disease which would
> account for the claimant's left hip and left thigh
> symptoms, but this is not supported by the evidence
> of record. It also appears that Dr. Knower became the
> claimant's treating physician as a result of doctor
> shopping on the part of the claimant. Accordingly,
> based on the overall evidence of record, limited
> weight is given to the conclusions of this treating
> physician.

<u>Id</u>.

The ALJ accepted the testimony of Dr. Dragovich that Ms.

Revard-Currey had intermittent depression, controlled by

medications since 2000, and her conclusion that Ms. Revard-

Currey's primary diagnosis was an undifferentiated somatoform

disorder, with insufficient evidence on the existence of a

personality disorder because of issues with Ms. Revard-Currey's

use and possible overuse of medications. The ALJ also accepted her

conclusion that Ms. Revard-Currey had mild restrictions in

activities of daily living, mild to moderate difficulty in

maintaining social functioning, and moderate difficulty in maintaining concentration, persistence or pace. Tr. 32.

The ALJ found that Ms. Revard-Currey's mental impairment was severe, but not accompanied by the findings specified for any impairment or combination of impairments included in the Listings.

The ALJ found that Ms. Revard-Currey's allegations about her symptoms and limitations, "whether based on physical or mental disorders," could not be "wholly accepted as credible." Tr. 33. This finding was based on Ms. Revard-Currey's claims to medical practitioners that she had MS, when the record indicated that she did not, and the absence of any evidentiary support in the medical records from the 1980s for her statements that she had been totally disabled and partially paralyzed by exposure to pesticides, or her statement in 1995 that she had vertigo for 10 years, triggered by the toxic exposure. The ALJ noted her claim in April 1982 of exposure to fumes at work had been denied by her employer. The ALJ concluded, "despite comprehensive medical evaluation, the claimant acknowledged that no medical cause was ever found for her reported symptoms." Tr. 33.

The ALJ found Ms. Revard-Currey's reports of her musculoskeletal pain, numbness, and spasms not credible because her complaints were "highly disproportionate to what are essentially unremarkable signs and findings." Id. The ALJ also found that the record contained evidence of drug-seeking behavior,

and, after seeing many doctors who, by her own report, "did not believe her," she "eventually found her current treating physician who provides her with methadone." Id. The ALJ noted, "This is somewhat surprising at this point because Dr. Knower at one point felt that narcotics were not warranted." Id. The ALJ acknowledged that hypochondriacal symptoms can be disabling, but found, on the basis of Dr. Dragovich's testimony, that Ms. Revard-Currey's psychological impairments created only mild to moderate limitations.

The ALJ also based his credibility finding on the medical evidence of comprehensive neurologic evaluations by Doctors Koller, Buchholz, Depper, and Andrews, which failed to support Ms. Revard-Currey's alleged symptoms. He noted that Dr. Depper had described Ms. Revard-Currey's affect as unusual, in that touching her anywhere resulted in painful grimacing and shaking of the head, but within 15 to 30 seconds, she would be smiling, "almost laughing;" he also noted Dr. Depper's statement to Ms. Revard-Currey that he would not be able to support her quest for disability benefits. The ALJ noted Dr. Andrews's comments on Ms. Revard-Currey's exaggerated pain behaviors. Id. The ALJ found that initially, Dr. Knower had merely diagnosed chronic pain "suggestive of fibromyalgia although with inconsistent features" and advised her that narcotics were not warranted; he also noted Dr. Knower's notation that Ms. Revard-Currey was able to sit and

stand without difficulty despite her complaints of total pain. The ALJ noted "several other entries indicating the patient, despite normal examinations, specifically requests pain medications and being advised that they were not warranted and addictive." Id.

The ALJ found that Ms. Revard-Currey retained the residual functional capacity to perform a reduced range of medium exertional level work, because of her moderate limitations of concentration, persistence and pace, which would "preclude extremely complex jobs but would not affect most work duties." Id. The ALJ accepted the VE's opinion that Ms. Revard-Currey could return to her past relevant work as an insurance clerk, and that she was therefore not disabled. Tr. 35.

**Standards**

The initial burden of proving disability rests on the claimant. Johnson v. Shalala, 60 F.3d 1428, 1432 (9th Cir. 1995). To meet this burden, the claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which ... has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A).

A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §

423(d)(3). This means an impairment must be medically determinable before it is considered disabling.

The Commissioner has established a five-step sequential process for determining whether a person is disabled. Bowen v. Yuckert, 482 U.S. 137, 140 (1987); 20 C.F.R. §§ 404.1520, 416.920.

In step one, the Commissioner determines whether the claimant has engaged in any substantial gainful activity. 20 C.F.R. §§ 404.1520(b), 416.920(b). If not, the Commissioner goes to step two, to determine whether the claimant has a "medically severe impairment or combination of impairments." Yuckert, 482 U.S. at 140-41; 20 C.F.R. §§ 404.1520(c), 416.920(c). That determination is governed by the "severity regulation," which provides:

> If you do not have any impairment or combination of impairments which significantly limits your physical or mental ability to do basic work activities, we will find that you do not have a severe impairment and are, therefore, not disabled. We will not consider your age, education, and work experience.

§§ 404.1520(c), 416.920(c). If the claimant does not have a severe impairment or combination of impairments, the disability claim is denied. If the impairment is severe, the evaluation proceeds to the third step. Yuckert, 482 U.S. at 141.

In step three, the Commissioner determines whether the impairment meets or equals "one of a number of listed impairments that the [Commissioner] acknowledges are so severe as to preclude

substantial gainful activity." <u>Yuckert</u>, 482 U.S. at 140-41. If a claimant's impairment meets or equals one of the listed impairments, he is considered disabled without consideration of her age, education or work experience. 20 C.F.R. s 404.1520(d), 416.920(d).

If the impairment is considered severe, but does not meet or equal a listed impairment, the Commissioner considers, at step four, whether the claimant can still perform "past relevant work." 20 C.F.R. §§ 404.1520(e), 416.920(e). If the claimant can do so, he is not considered disabled. <u>Yuckert</u>, 482 U.S. at 141-42. If the claimant shows an inability to perform his past work, the burden shifts to the Commissioner to show, in step five, that the claimant has the residual functional capacity to do other available work in consideration of the claimant's age, education and past work experience. <u>Yuckert</u>, 482 U.S. at 141-42; 20 C.F.R. §§ 404.1520(f), 416.920(f).

### Discussion

Ms. Revard-Currey asserts that the ALJ erred in the following: 1) failing to include pain and "drop attacks" as impairments in the hypothetical to the VE; 2) failing to give clear and convincing reasons for rejecting the opinion of treating physician Dr. Knower; and 3) failing to consider her impairments in combination.

///

1.  Failure to include pain and drop attacks in
    hypothetical to the VE

Ms. Revard-Currey asserts that there was evidence in the record sufficient to show some physical limitations, but the ALJ failed to include any physical limitations in his hypothetical question to the VE. Ms. Revard-Currey asks that the case be remanded for further proceedings so that the Commissioner can develop the record more fully with respect to those physical limitations. Ms. Revard-Currey cites Webb v. Barnhart, 433 F.3d 683 (9th Cir. 2005) and Ukolov v. Barnhart, 420 F.3d 1002 (9th Cir. 2005).

In Webb, the ALJ made a step two determination that Webb did not have a medically severe impairment or combination of impairments. Having made that finding, the ALJ ended his inquiry because there was no way that Webb could prove he was disabled within the meaning of the Act. Webb challenged this preemptive finding. 433 F.3d at 686. The court found in the record objective medical evidence of back pain, hypertension, knee pain, hip pain, visual disturbances, memory loss, diverticulitis, sleeplessness, and difficulty performing physical tasks. Id. at 687. The court held that although the medical record was incomplete, it included evidence of impairments sufficient to pass the de minimis threshold of step two.

///

63  - OPINION AND ORDER

In <u>Ukolov</u>, the issue was whether a treating neurologist's statements about her own observations of the claimant's gait and balance were sufficient to get the claimant over the step two threshold, even though the neurologist had acknowledged that "a very exhaustive neurological work-up," left her unable to "establish a definite neurological diagnosis." 420 F.3d at 1004.

The court held that the neurologist's statements were insufficient to establish the existence of any medically determinable impairment, so that the Commissioner properly ended the analysis at step two.

The court pointed out that to qualify for benefits, Ukolov was required to show a physical or mental impairment resulting from abnormalities demonstrable by medically acceptable clinical and laboratory diagnostic techniques. 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D). The court quoted from Social Security Ruling (SSR) 96-4p: "[T]he regulations ... provide that under no circumstances may the existence of an impairment be established on the basis of symptoms alone." 420 F.3d at 1005.

SSR 96-4p distinguishes between symptoms and signs:

[S]ymptoms ... are an individual's own perception or description of the impact of his or her physical or mental impairment(s) ... [W]hen any of these manifestations is an anatomical, physiological, or psychological abnormality that can be shown by medically acceptable clinical diagnostic techniques, it represents a medical "sign" rather than a "symptom."
                    * * *

> [R]egardless of how many symptoms an individual
> alleges, or how genuine the individual's complaints
> may appear to be, the existence of a medically
> determinable physical or mental impairment cannot be
> established in the absence of objective medical
> abnormalities; i.e., medical signs and laboratory
> findings ... In claims in which there are no medical
> signs or laboratory findings to substantiate the
> existence of a medically determinable physical or
> mental impairment, the individual must be found not
> disabled at step 2 of the sequential evaluation
> process.

420 F.3d at 1005, *quoting* SSR 96-4p.

Both these cases are factually distinguishable because in them, the ALJ made a severity determination at step two. In the present case, the ALJ went to step four of the sequential analysis and determined, on the basis of testimony from the VE, that Ms. Revard-Currey could perform past relevant work.

Despite the large number of diagnostic tests and physical examinations in the record, there are no medical signs or laboratory findings to support the existence of a condition that could account for pain all over Ms. Revard-Currey's body or the alleged drop attacks.

The record shows normal nerve conduction studies of the lower extremities in 2004; normal physical examinations in 1982 (Dr. Miller), 1995 (Dr. Cawthon), 1999(Dr. Modell), March 2000 (Dr. Koller), June 2000 (Dr. Fohrman), November 2000 (Dr. Koller), January 2001 (Dr. Koller), February 2001 (Dr. Buchholz and Dr. Andrews), April 2001 (Dr. Depper), March 2002 (Dr. Koller), March

2004 (Dr. Buchholz), October 2004 (Dr. Carroll and Dr. Lee); normal MRIs of the brain and spinal cord in 1994, tr. 262, 1999, tr. 510, and January 2001, tr. 329, 565-66, 568; a normal EEG in April 2004, tr. 653; and a normal lumbar puncture in 2002, tr. 568. In the absence of objective, clinical evidence, I find no error in the ALJ's failure to consider Ms. Revard-Currey's alleged pain all over her body and drop attacks as impairments.

Ms. Revard-Currey asserts that the ALJ had a duty to develop the record with respect to her allegations of pain and drop attacks. The ALJ's duty to develop the record is triggered "only when there is ambiguous evidence or when the record is inadequate to allow for proper evaluation of the evidence." Mayes v. Massanari, 262 F.3d 963, 968 (9th Cir. 2001), as amended, 276 F.3d 453 (9th Cir. 2002). The duty does not extend to a silent record that does not support disability. Armstrong v. Commissioner, 160 F.3d 587, 589 (9th Cir. 1998). Because the record contains no medical evidence supporting the allegations of pain all over her body and drop attacks, the ALJ had no duty to develop the record further.

I also note that the ALJ found Ms. Revard-Currey not credible in her testimony about pain and drop attacks, and that Ms. Revard-Currey has not challenged that credibility finding.

But there is some clinical evidence of carpal tunnel syndrome, although medical practitioners differ on whether Ms.

Revard-Currey has symptoms attributable to it.[12] Although Dr. Modell did not think Ms. Revard-Currey's mild carpal tunnel was causing her symptoms, Dr. Koller thought it might be the cause of the upper extremity symptoms and perhaps some of the neck and upper back symptoms. Tr. 510, 343. Reviewing physician Dr. Westfall opined in 2000 that Ms. Revard-Currey's diagnosis of bilateral carpal tunnel syndrome supported limitations on handling objects to no more than occasionally. Tr. 308. But on March 27, 2002, a physical examination by Dr. Knower revealed that Ms. Revard-Currey's neck, shoulders, arms, forearms, wrists, and hands had full range of motion and were non-tender. Tr. 504. In April 2004, Dr. Buchholz found evidence of carpal tunnel syndrome that was "fairly severe bilaterally," tr. 652, but not requiring surgery. (Although the date of the report indicates that the ALJ did not have access to this evidence.) Ms. Revard-Currey's husband testified that he had seen her "shaking her hands because ... they're asleep." Tr. 725. The ALJ did not reject this testimony.

---

[12] There is also MRI evidence of disc bulging in the cervical and lumbar spine, which several practitioners thought was without effect on the spinal cord. See tr. 175, 511, 652. Dr. Knower thought spinal stenosis was causing Ms. Revard-Currey's lower extremity symptoms. However, the ALJ rejected this opinion because it was based on a December 2002 MRI for which there was no evidence in the record and because other medical practitioners were doubtful that stenosis could be causing Ms. Revard-Currey's reported upper or lower extremity symptoms. See, e.g., tr. 343 (Koller); tr. 367 (Buchholz) tr. 377 (Andrews)(doubtful that cervical spine stenosis causing problems);tr. 370 (Depper)(subjective symptoms dramatically out of proportion to physical findings).

Despite this evidence, the ALJ failed to address the effect on Ms. Revard-Currey's residual functional capacity of the physical impairment of carpal tunnel syndrome in his decision, and failed either to include or explain the exclusion of the limitations found by Dr. Westfall in his hypothetical to the VE.

A VE's testimony cannot constitute substantial evidence to support an ALJ's determination as to a claimant's disability status unless it accurately reflects all of the claimant's limitations. Andrews v. Shalala, 53 F.3d 1035 (9th 1995); Cooper v. Sullivan, 880 F.2d 1152, 1158 n. 13 (9th Cir. 1989). The ALJ's failure to include limitations imposed by the carpal tunnel syndrome in his hypothetical to the VE was erroroneous. On the record before me, it cannot be ascertained whether Ms. Revard-Currey's ability to perform her past relevant work as an insurance checker is inconsistent with Dr. Westfall's opinion that Ms. Revard-Currey was precluded from overhead reaching and use of the hands on a more than occasional basis.[13]

_____

[13] The Dictionary of Occupational Titles describes the position of insurance checker, Code 219.482-014, as follows:

Verifies accuracy of insurance company records, performing any combination of the following duties: Compares computations on premiums paid, interest, and data with same data on other records. Verifies data on applications and policies, such as age, name, and address, principal sums, and value of property. Proofreads printed material concerning insurance programs. Verifies computations on interest accrued, premiums due, and settlement surrender or loan values, using calculator, manuals, and rate books. May train new employees. May be designated according to data checked as

I conclude that a remand, limited to consideration of carpal tunnel syndrome as a physical impairment, is appropriate. The remand is discussed below.

2.    Failure to provide clear and convincing reasons for rejecting the opinions of Dr. Knower

Ms. Revard-Currey asserts that the ALJ's reasons for rejecting Dr. Knower's opinions were not clear and convincing. However, because Dr. Knower's opinions were contradicted, the ALJ was not required to supply clear and convincing reasons for rejecting them.

Title II's implementing regulations distinguish among the opinions of three types of physicians: 1) those who treat the claimant; 2) those who examine but do not treat; and 3) those who neither examine nor treat. Holohan v. Massanari, 246 F.3d 1195, 1201 (9th Cir. 2001); Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1995); 20 C.F.R. § 404.1527(d). Generally, a treating physician's opinion carries more weight than an examining physician's and an examining physician's opinion carries more weight than a reviewing physician's. Holohan, 246 F.3d at 1202; Lester at 830; 20 C.F.R. § 404.1527(d). In addition, the regulations give more weight to opinions that are explained than to those that are not, Holohan,

_____

Abstract Checker (insurance); Policy Checker (insurance). The DOT identifies the position as one involving a sedentary level of exertion, but does not provide any guidance on whether more than occasional use of the hands is required to perform the job. http://www.occupationalinfo.org/21/219482014.html.

246 F.3d at 1202, see also 20 C.F.R. § 404.1527(d), and to the opinions of specialists concerning matters relating to their specialty over that of nonspecialists, see id. and § 404.1527(d)(5).

If the treating physician's medical opinion is inconsistent with other substantial evidence in the record, treating source medical opinions are still entitled to deference and must be weighted using all the factors provided in 20 C.F.R. § 404.1527. Id. These factors include the opinion's evidentiary support, particularly medical signs and laboratory findings, consistency with the record as a whole, and specialization. Id. at (d)(1)-(6).

Similarly, if the treating physician's opinion on the issue of disability is controverted, the ALJ must provide "specific and legitimate" reasons in order to reject the treating physician's opinion. Id.

Dr. Knower's medical opinions, and his opinion on the issue of disability are controverted by those of both examining and treating physicians. Except for Dr. Knower, who appears to be a general practitioner, no other physician, whether treating or examining, attributed Ms. Revard-Currey's lower extremity symptoms or "drop attacks" to nerve root compression. In 1999, Dr. Modell, a neurologist, said she saw no evidence of a generalized peripheral neuropathy, and that she had "no explanation" for Ms. Revard-Currey's complaints. Tr. 299, 510. Dr. Koller, also a

treating physician, but one whose specialty does not appear in the record, had no explanation for the numbness in the legs or the dragging of the leg. Tr. 343. Dr. Koller found no evidence of significant spinal stenosis that would produce myelopathy, id., and no "clear-cut neurologic deficit." Tr. 338. Dr. Buchholz, also a neurologist, found "no real hard neurological findings." Tr. 367.

Except for Dr. Knower, no other physician thought Ms. Revard-Currey was precluded from working. Dr. Andrews, a treating physician, said he had "no reason to feel that she is disabled." Tr. 374. Dr. Depper, an examining physician, told Ms. Revard-Currey it would be difficult for him to support a disability application. Tr. 370.

Because Dr. Knower's opinions are contradicted by those of other practitioners, the ALJ's rejection of those opinions had to be supported by "specific and legitimate" reasons. The ALJ's stated reasons for rejecting the opinions of Dr. Knower are based on the inconsistency between Dr. Knower's opinions and those of the other treating and examining practitioners, and on the absence of evidentiary support, particularly the December 2002 MRI and a May 2002 x-ray of Ms. Revard-Currey's lower back, for his diagnosis of degenerative disc disease.

The ALJ may properly reject any doctor's opinion if it is unsupported by the record as a whole, or is premised on a

claimant's properly discredited subjective complaints. <u>Bayliss v.</u> <u>Barnhart</u>, 427 F.3d 1211, 1216-17 (9th Cir. 2005). I conclude that the ALJ's reasons for rejecting Dr. Knower's opinions meet the "specific and legitimate" standard and are supported by substantial evidence in the record as a whole. I therefore find no error.

3. <u>  Failure to consider combined effect of impairments</u>

Ms. Revard-Currey asserts that the ALJ erred in failing to consider the combined effect of all her impairments, particularly the degenerative disc disease, the fibromyalgia-like syndrome, depression and anxiety, and the "drop attacks."

As discussed, the only diagnosis of degenerative disc disease was made by Dr. Knower. The ALJ rejected this diagnosis for specific and legitimate reasons supported by substantial evidence in the record.

No medical practitioner made a diagnosis of fibromyalgia. The practitioners' discussions of "fibromyalgia-like syndrome" are based on their conclusions that Ms. Revard-Currey's subjective complaints of pain all over her body were *inconsistent with* fibromyalgia. So, for example, Dr. Fohrman wrote that Ms. Revard-Currey's complaints were "beyond those I would expect to see with the usual fibromyalgia," tr. 379, and Dr. Depper, a rheumatologist, said, "her subjective symptoms are dramatically out of proportion to her physical findings. ... I certainly cannot

make a diagnosis." Tr. 369. Dr. Lee noted that except for tenderness in her back, Ms. Revard-Currey had no trigger points elsewhere. Tr. 674.

As discussed above, subjective symptoms in the absence of medical signs and laboratory findings indicating objective medical abnormalities do not establish the existence of a medically determinable physical impairment. The ALJ was therefore not required to consider Ms. Revard-Currey's "fibromyalgia-like syndrome" as a physical impairment.

The same analysis applies to the "drop attacks," for which no medical explanation was ever found despite extensive neurological work-ups. When numerous medical examinations fail to disclose any underlying medical cause for ailments of which claimant complains, the ALJ is not required to consider those ailments in the disability analysis. See Saelee v. Chater, 83 F.3d 322 (9th Cir. 1996).

And finally, with respect to the depression and anxiety, the ALJ made a specific finding, based on the testimony of Dr. Dragovich, that these conditions were controlled with medication. An impairment that is under control cannot support a finding of disability. Celaya v. Halter, 332 F.3d 1177, 1185 (9th Cir. 2003)(Rawlinson, J., dissenting); Sample v. Schweiker, 694 F.2d 639, 642 (9th Cir. 1992).

///

4.   <u>Remand</u>

Because the ALJ failed to consider the effect of Ms. Revard-Currey's carpal tunnel syndrome diagnosis on her residual functional capacity, remand under "sentence four" of 42 U.S.C. § 405(g) is appropriate. Sentence four provides:

> The court shall have the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Secretary, with or without remanding the cause for a rehearing...

Whether to remand under sentence four is a matter of judicial discretion. <u>Harman v. Apfel</u>, 211 F.3d 1172, 1177 (9th Cir. 2000). A remand for further proceedings is appropriate when, as here, the record is not fully developed and it is not clear from the record whether the ALJ would or would not be required to award benefits. See, e.g., <u>Ghokassian v. Shalala</u>, 41 F.3d 1300, 1303 (9th Cir. 1994).

## Conclusion

I find no error in the Commissioner's decision that Ms. Revard-Currey is not disabled by any of her alleged impairments, with the sole exception of the carpal tunnel syndrome. I conclude that the ALJ erred in failing to consider the effect of Ms. Revard-Currey's carpal tunnel syndrome when assessing her residual functional capacity. Because a limitation to occasional use of the hands was not included in the ALJ's hypothetical question to the VE, the VE's testimony does not provide evidentiary support for

74  - OPINION AND ORDER

the ALJ's finding at step four that Ms. Revard-Currey could return to her past relevant work as an insurance checker. There is no evidence in the record to indicate whether a diagnosis of carpal tunnel syndrome, to the extent Ms. Revard-Currey may have it, is inconsistent with the physical exertion requirements of the job of insurance checker.

The Commissioner's decision is remanded for further administrative proceedings, limited to the sole question of what effect, if any, the diagnosis of carpal tunnel syndrome has on Ms. Revard-Currey's ability to return to her past relevant work or to any other work that exists in the national economy.

IT IS SO ORDERED.

Dated this 24th day of April, 2007.

/s/ Dennis James Hubel
Dennis James Hubel
United States Magistrate Judge